UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE DYE,

                Plaintiff,
                                      Case No. 2:23-cv-10065

v.
                                        Honorable Susan K. DeClercq
                                        United States District Judge

CITY OF HAZEL PARK, et al.,

                Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 24)

Late on a July night, Dwayne Dye, a 52-year-old Black Marine Corps veteran, was driving home with his girlfriend when he began to suspect someone was following him. Hoping to shake off the other car, he began driving faster, switching lanes, and then turned onto a side street before turning off his headlights. Hazel Park Police Officer Trevor Deanovich saw Dye's driving and decided to pull him over. When Deanovich asked Dye about his driving, Dye chose to remain silent, offering his license and registration without further comment. In response, Deanovich ordered him out of the car and arrested him.

Dye brought an 11-count lawsuit against the City of Hazel Park, Officer Deanovich, and the other officer who was on scene. After Dye voluntarily dismissed nine of his claims (including the only ones against the City), only two claims brought

against the Officers under 42 U.S.C. § 1983 remain: arrest without probable cause and false imprisonment, both in violation of the Fourth and Fourteenth Amendments. The Officers moved for summary judgment, asserting qualified immunity as an affirmative defense.

Because there are genuine issues of material fact as to whether probable cause existed to arrest Dye the Officers are not entitled to qualified immunity at this stage, and summary judgment will be denied.

## I. BACKGROUND

On July 17, 2022, just before 1:00 AM, Dwayne Dye was driving home from a comedy show with his girlfriend, Yolanda Patrick. ECF No. 24-6 at PageID.225. While driving east on Eight Mile Road, Dye noticed a car that seemed to be following him. *Id*. at PageID.226. Dye began to worry that the car following him was attempting to carjack him, so Dye "sped up" and began making "evasive maneuvers" by "switching lanes." ECF No. 24-6 at PageID.226, 228.

Defendant Trevor Deanovich, a Hazel Park Police Officer, saw Dye speeding and switching lanes and began following him. ECF No. 24-8 at PageID.320. He watched Dye change lanes without a turn signal several times, at one point cutting off another car and forcing it to brake abruptly. *Id.* at PageID.322. Suddenly, Dye turned off Eight Mile onto a residential street, where he turned off his headlights and kept driving. *Id*. Two blocks later, Deanovich pulled Dye over. *Id*.

- 2 -

The remaining interactions between the Hazel Park Police, Dye, and his girlfriend were all captured on Deanovich's body camera, *see* ECF Nos. 24-3; 24-4.

When Deanovich got out of his car, Dye held his hands outside of his car window, open, to show he was "not a threat." ECF No. 24-6 at PageID.231. Deanovich reached Dye's car, and immediately said, "well, that was not smart." ECF No. 24-4 at PageID.182. Dye asked what the officer meant and Deanovich replied, "your speeding, flowing down on this road, darkening out your lights." *Id.* In response, Dye asked if Deanovich wanted to see his identification, which Deanovich did. *Id.*

While Dye gathered his identification and paperwork, Deanovich asked again, "So what's with the speed?" *Id.* Dye did not respond, but handed Deanovich his license, veteran identification card, and proof of insurance. *Id.*; ECF No. 24-6 at PageID.231. Upon receiving no response, Deanovich asked Dye twice if Dye had heard him, then ordered Dye out of the car. ECF No. 24-4 at PageID.182. Immediately, Dye asked Deanovich to call the sergeant on duty. *Id.* Deanovich responded, "That's not how that works." Dye asked for the sergeant three more times, and twice more Deanovich refused before finally saying, "Sir, are you gonna step out or [am I] going to yank you out?" *Id.* As Dye stepped out of the car, he asked Yolanda to call 911. *Id.* Deanovich told Dye to turn around and frisked him for weapons. *Id.* While being searched, Dye asked Yolanda to call the police and ask for

a sergeant or lieutenant on duty. *Id.* When Deanovich finished the pat down, he told Dye to place his hands behind his back. *Id.*

In response, Dye placed his hands behind his back and knelt to the ground. ECF Nos. 24-3 at 2:27–2:30; 24-6 at PageID.246. Later, he testified that he knelt because he "didn't want [Deanovich] to shoot [him]." ECF No. 24-6 at PageID.246. Deanovich, by contrast, was confused by Dye kneeling, telling him, "I'm not really sure what you're doing. All I asked you is to place your hands behind your back." ECF No. 24-4 at PageID.183. Deanovich handcuffed Dye, pulled him back on his feet, and then put Dye in the back of the police car. During the entire episode, Dye continued instructing Yolanda to call 911. *Id.*; ECF Nos. 24-3 at 2:33–3:45; 24-4 at PageID.183.

Deanovich then used his radio to note he had "detained" someone for resisting and obstructing and possibly for operating while intoxicated. ECF No. 24-4 at PageID.183.

After ordering Yolanda out of the car, the officers proceeded to search Dye's car, both to inventory the contents and to look for any evidence that Dye or his passenger had been drinking. ECF Nos. 24-3 at 6:38–7:28; 24-8 at PageID.353. While searching, Deanovich told Hollifield that Dye was "definitely intoxicated" and that he was driving "about 70" miles per hour down Eight Mile Road. ECF No.

24-4 at PageID.184. Finding nothing of note in the car or the trunk, Deanovich went back to his car. *Id.* at PageID.353–54; ECF No. 24-3 at 6:38–8:48.

After Deanovich sat back down in the driver's seat, Dye asked Deanovich from the back seat what was happening and why he had been pulled out of his car. ECF No. 24-4 at PageID.185. Deanovich replied, "I asked you to step out because you weren't talking to me. I could smell alcohol on you." *Id.* Immediately, Dye denied that he smelled like alcohol and asked for a blood test or a sobriety test. *Id.* Deanovich agreed, but when Dye again asked for a supervisor, Deanovich said, "I don't need you to take this test. You wanted to." *Id.* Dye confirmed he wanted to take the test but still wanted a supervisor. *Id.* Deanovich explained that the sergeant needed to stay at his desk, so he couldn't come to the scene. *Id.* At that point, Dye consented to a preliminary breath test (PBT). *Id.* While waiting for the PBT results, Deanovich asked Dye a few questions to assess his mental condition, including: (1) do you know what time it is? (2) do you know who the current president is? And (3) do you know where you are right now? *Id.* Dye answered each correctly. *Id.*

The result of the PBT showed that Dye had a blood alcohol concentration of 0.00. ECF No. 24-8 at PageID.356. But Deanovich continued investigating, and asked Dye if *Yolanda* had been drinking. ECF No. 24-4 at PageID.187. Dye insisted that neither he nor Yolanda had been drinking, and invited the officer to "check the vehicle." *Id.* Deanovich then asked if Dye had "take[n] any substances." *Id.* Dye

Case 2:23-cv-10065-SKD-DRG    ECF No. 32, PageID.506    Filed 03/19/25    Page 6 of 23

said he had not. *Id.* Dye further explained that he believed someone was following him, and that his driving was because he was trying to get away, not because he was drunk or high. *Id.* When Dye insisted, "I'm not doing anything wrong," Deanovich replied, "[t]he only thing you did wrong was not cooperating with me." *Id.* After discussing back and forth about whether Dye had any obligation to answer Deanovich's questions earlier, Dye said, "now you see I'm not drunk." *Id.* at PageID.188. He continued, "now the proper thing to do is to go ahead and let me go." *Id.*

But before doing so, Deanovich asked Dye to get out of the car again to "check [his] eyes real quick." *Id.* Dye agreed but told the officers that he is a diabetic. *Id.* Before Deanovich administered more sobriety tests—a horizontal gaze nystagmus test (HGN) and a vertical gaze nystagmus (VGN) test—he asked Dye again if he had taken any drugs. *Id.* Dye said no. ECF No. 24-4 at PageID.188. Focusing in on the diabetes, though, the Officers asked Dye if he needed insulin. *Id.* Dye said no because he takes it before bed. *Id.* But after completing the HGN and VGN tests, ECF No. 24-3 at 18:59–20:35, Deanovich loosened Dye's handcuffs, *id.* at 20:39–21:19, and put him back into the police car, saying, "I'm gonna close the door and make a phone call real quick." *Id.* at PageID.189. Before Deanovich turned off the audio on his body worn camera, Hollifield said to him, "If anything he might, it might be diabetic related." *Id.*

Twelve minutes later, Deanovich returned to his car to talk to Dye. *Id.* at PageID.189–91; ECF No. 24-3 at 22:05–34:20. He told Dye, "We're going to have an ambulance come check your blood sugar." ECF No. 24-4 at PageID.191. When Dye asked why he needed an ambulance, Deanovich responded, "Because you are a diabetic and you missed your insulin." *Id.* Dye asked, "Can you just give me a ticket and let [Yolanda] drive me home?" *Id.* But Deanovich responded that they still had to do their "due diligence" to make sure Dye didn't "die on the way home." *Id.* at PageID.192.

While waiting for the ambulance to arrive, the Officers told Dye that his car would not need to be impounded and that he could go after his blood sugar got checked. *Id.* Dye then asked, "if I'm not being detained, can I take these handcuffs off?" *Id.* Deanovich agreed and removed the handcuffs, ECF No. 24-3 at 34:41–36:21, but noted, "you're still not free to leave right now," No. 24-4 at PageID.192. He then asked Dye to sit back in the car and locked him in again. *Id.* at PageID.193; ECF No. 24-3 at 36:23–36:34.

At that point, the Officers began discussing the "smell coming from [Dye's] car." ECF No. 24-4 at PageID.193. Hollifield called the smell "sweet and fruity" and said, "when I got here I could smell it. I thought it was, it was booze." *Id.* He wondered aloud if the smell had come from a cleaner or air freshener. *Id.* But after

talking to Yolanda, he concluded, "she's sober as sober," so she was not the source of the smell. *Id.*

When the ambulance arrived, Deanovich told the paramedic that Dye had "missed his insulin dose" by a few hours. Even so, Dye refused medical attention from the paramedics. *Id.* The Officers determined that Dye could refuse so long as Yolanda was driving him home. *Id.* So Deanovich handed Dye a ticket for impeding traffic, ECF No. 24-5, but before he could "explain the ticket" to Dye, Dye told Deanovich "You don't know who the fuck I am," and took his keys and drove away. ECF No. 24-4 at PageID.194.

About five months later, on December 8, 2022, Dye challenged his traffic ticket in the 43-1 District Court in Oakland County. ECF No. 24-8. There, Officer Deanovich testified to his observations of Dye's driving. *Id.* At the traffic hearing, Deanovich notably stated that one of the reasons he suspected Dye of OWI was that Dye had admitted to having three alcoholic drinks. ECF No. 24-8 at PageID.323. Later in the hearing, counsel doubled down on this, arguing that Dye admitted that he drank a cocktail earlier in the night. *Id.* at PageID.399. Dye never admitted to drinking. To the contrary, he insisted throughout the entire videoed encounter that he had *not* been drinking. *See* ECF Nos. 24-3; 24-4. The 0.00 breath test result supports his adamant denial. *Id.*; ECF No. 24-8 at PageID.356.

Later in the hearing, after Deanovich had finished his testimony and the City had finished presenting its case in chief, the City moved to amend the ticket from impeding traffic to: (1) speeding 26 miles per hour or over; (2) impeding or blockading traffic; (3) failing to signal; and (4) operating without lights. *Id.* at PageID.390. Over Dye's objections, the court granted the motion to amend, and ultimately found Dye responsible for all four infractions, which increased his original ticket from $190 to $730. *Id.* at PageID.392, 403–05.

In January 2023, Dye sued the City of Hazel Park and both Officers. ECF No. 1. Dye originally brought eleven counts against them, including several under 42 U.S.C. § 1983 for violations of his constitutional rights. *Id.*

Defendants moved for summary judgment, arguing that Deanovich had probable cause to arrest Dye and that regardless, qualified immunity applied. ECF No. 24. Since then, Dye agreed to dismiss nine counts, including his claims against the City of Hazel Park.[1] ECF Nos. 25; 28. Only two § 1983 claims against the Officers remain: arrest without probable cause in violation of the Fourth and Fourteenth Amendments (Count I), and false imprisonment in violation of the Fourth and Fourteenth Amendments (Count III).

---

[1] Although the August 15, 2024, Stipulated Order of Dismissal dismissed the only remaining claims against the City of Hazel Park, the City was inadvertently not dismissed from this case. Accordingly, the City of Hazel Park will be dismissed from the case at this time according to the Parties stipulated dismissal. *See* ECF No. 28.

The motion for summary judgment has been fully briefed, ECF Nos. 27; 29, and on February 28, 2025, this Court held a hearing on the motion. For the reasons that follow, summary judgment will be denied because Dye has demonstrated a genuine issue of material fact as to whether a reasonable officer would have probable cause for an OWI arrest, based on the facts known to the officers at the time. Further, qualified immunity is improper because the determination hinges on these unresolved fact questions.

## II. STANDARD OF REVIEW

To prevail on summary judgment, movants must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a). If so, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than a mere "scintilla of evidence," *id.* at 251, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See id.* at 251–52.

## III. ANALYSIS

To prevail on a § 1983 claim, a plaintiff must prove that he was deprived of "a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Here, Dye alleges that the Officers violated his Fourth and Fourteenth Amendment rights by (1) arresting him without probable cause and (2) falsely imprisoning him. ECF No. 1. But the Officers argue that even if Dye can make such a showing, qualified immunity bars his claims. ECF No. 24 at PageID.153. Qualified immunity prevents liability for government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

### A. Qualified Immunity Standard

Whether an official is entitled to qualified immunity is a two-pronged inquiry. "First a court must decide whether the facts the plaintiff has alleged or shown make up a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, "the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* The steps may be

- 11 -

addressed in any order. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Although an earlier case need not have resolved the exact issue, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This is where courts must narrow in on the specific circumstances under which the claim arose. *al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts…not to define clearly established law at a high level of generality.").

Although "entitlement to qualified immunity is a threshold question to be resolved at the earliest point," *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023), qualified immunity should not be granted where "the legal question of qualified immunity turns upon which version of the facts one accepts. . . . This is especially true considering that the District Court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment." *Sova v. City of Mount Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (citations omitted).

## B. Arrest Without Probable Cause

### 1. Clearly Established Right

"The constitutional right to 'freedom from arrest in the absence of probable cause' is clearly established within our circuit." *Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016) (quoting *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015)). But even so, "an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). So, although the right is clearly established in the broadest sense, the "information possessed at the time" by the officer must still have been so insufficient that no reasonable officer could have believed there was probable cause to arrest. *Id.*; *Mullenix*, 577 U.S. at 11.

The Sixth Circuit has denied qualified immunity and summary judgment, in a case on all fours with this one, when genuine disputes existed as to the facts known to the officer at the time. *Miller*, 606 F.3d at 248. In that case, the defendant deputy argued that he had probable cause for OWI because the plaintiff: (1) drove through a stop sign at 30 miles per hour, (2) smelled of alcohol, (3) had "glazed or glossy" eyes, and (4) failed multiple sobriety tests. *Id.* The Sixth Circuit reversed the district

court's grant of summary judgment, noting that the record evidence called into question the deputy's credibility:

> Although [defendant's] claims, if believed, would constitute probable cause to arrest for driving under the influence of alcohol, a jury could reasonably conclude, in light of the 0.00% blood alcohol result and [plaintiff's] testimony, that [defendant] was being untruthful generally about his observations and did not have probable cause to believe [plaintiff] was drinking. In light of the conflict in the evidence, the jury could conclude that [defendant] was lying.

*Id.* at 249. Accordingly, the right to be free of arrest without probable cause, at least where material factual disputes exist as to the facts known to the officer at the time, has been clearly established. *Courtright*, 839 F.3d at 520; *Miller*, 606 F.3d at 248. And in effect, *Miller* served to put Defendants on notice that an OWI arrest on such limited evidence could violate the Constitution. 606 F.3d at 248.

### 2. Constitutional Violation

So, the question remains: has Dye shown a genuine dispute over whether he was arrested without probable cause, precluding summary judgment and qualified immunity?

Note that this inquiry is limited to whether there was probable cause for *the arrest* only. That is because, at this Court's February 28, 2025, motion hearing, Plaintiff's counsel clarified that because of the traffic court case he was precluded from challenging the traffic court's determination that Dye had: (1) sped 26 miles per hour or over; (2) impeded traffic; (3) failed to signal; and (4) drove without

headlights. Accordingly, the Parties agreed that there was probable cause for *the traffic stop* based on how Dye was driving. ECF Nos. 24 at PageID.144; 27 at PageID.433.

Note also that this Court's inquiry is limited further to whether there was probable cause to arrest Dye *specifically for OWI*. At first blush, this limitation may seem strange—because, based on Dye's driving, wouldn't there be probable cause to arrest him for reckless driving, too?

Indeed, Defendants initially argued in their motion that the arrest was valid because there was probable cause for an arrest for OWI *or* for reckless driving. ECF No. 24 at PageID.145–46. This argument was consistent with the established principle that "[a]n arrest is valid so long as there is probable cause for a single charge of an arrestable offense," regardless of what was charged at the time. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (citing *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005)). In Michigan, both OWI and reckless driving are arrestable offenses. *See id.* at 248–49.

However, during the February 2025 motion hearing, Defendants explicitly abandoned the reckless driving argument. Indeed, this Court asked more than once to clarify, but Defendants' counsel twice confirmed that they were no longer arguing—and would not argue at trial, if the case continued—that the arrest was valid because Deanovich had probable cause for reckless driving. Defendants'

argument, as they clearly stated on the record, was now that the Officers had probable cause for *only* an OWI arrest—*not* for any another arrestable offense.

This development is important because it means that the Officers *expressly abandoned* any argument that probable cause existed for another arrestable offense besides OWI, which constitutes waiver. *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022) ("[A] litigant waives a legal claim by initially raising a claim and then explicitly abandoning it later."). And unlike *forfeiture* (i.e., when a party simply *fails* to raise an argument or claim), *waiver* means that an argument may *no longer* be considered, even on appeal. *Id.* (collecting cases). Because Defendants explicitly indicated multiple times in the February 2025 hearing that they were not raising the alternative argument that, even if there was no probable cause for an OWI arrest, probable cause did exist for a different arrestable offense, that argument was waived, and this Court may not consider it. *Id*. So, the Court's inquiry is limited to probable cause for OWI.

Turning now to that inquiry: an officer may make a warrantless, public arrest when he has probable cause to believe that that someone has committed a misdemeanor or felony in the officer's presence. *Farris v. Oakland Cnty.*, 96 F.4th 956, 964 (6th Cir. 2024) (citing *United States v. Watson*, 423 U.S. 411, 414–24 (1976)). Probable cause is not a particularly high bar; an officer has probable cause when "the facts and circumstances known to the officer warrant a prudent man in

Case 2:23-cv-10065-SKD-DRG   ECF No. 32, PageID.517   Filed 03/19/25   Page 17 of 23

believing that an offense has been committed." *Miller*, 606 F.3d at 248 (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). Because probable cause determinations "involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest," the existence of probable cause is generally "a jury question, unless there is only one reasonable determination possible." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (first quoting *Est. of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); and then quoting *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)).

According to the Officers, the totality of the circumstances supports a finding of probable cause to believe Dye was operating while intoxicated. They cite the following factors as evidence: (1) Dye's driving—which they categorize as "erratic"; (2) the time of night—12:50AM; (3) the smell of alcohol—"a fruity odor"; (4) Dye not responding to Deanovich's questions—which indicated a "lack of cooperation; and (5) Dye dropping to his knees when asked to exit the car. ECF No. 24 at PageID.146–47, 154. Taken together, Defendants argue, a reasonable officer would believe that these facts provide probable cause for OWI. *Id.* And Defendants go even further, asserting that "the parties agree that there are no issues of material fact as the entire encounter was recorded on Officer Deanovich's body worn camera." ECF No. 24 at PageID.139. If there truly were no issues of fact, and no reasonable juror could watch the body worn camera footage and dispute any of the above bases, then

- 17 -

there would likely be enough evidence for probable cause. *See Miller*, 606 F.3d at 248; *see also Onwenu v. Bacigal*, No. 18-CV-10980, 2019 WL 5788598, at *1 (E.D. Mich. Nov. 6, 2019), *aff'd in part, vacated in part, remanded*, 841 F. App'x 800 (6th Cir. 2021).

But that is not the case here. Contrary to Defendants' argument, there *are* genuine issues of fact as to their "evidence" of drunkenness. Even at the February 2025 hearing, Defendants conceded that the *only* undisputed facts were (1) that Dye committed the traffic violations he was found responsible for by the traffic court, and (2) that the driving and traffic stop happened around 1:00 AM. As for the rest, Dye has identified several relevant material factual disputes.

First, a reasonable juror could find that Deanovich's claim that he smelled alcohol is not credible. Not only did Dye deny smelling like alcohol initially, ECF No. 24-4 at PageID.185, but Deanovich also gave conflicting statements about the smell—telling Dye he smelled alcohol on *him* but telling Hollifield and writing in his police report that the odor came from the *car*. *Id.*at PageID.185, 193; ECF No. 24-2 at PageID.166. Deanovich's claim about smelling alcohol is undercut even further by the facts that (1) Dye ultimately had a BAC of 0.00 and (2) the Officers did not find any alcohol when they searched the car. ECF No. 24-8 at PageID.353– 56; *see Miller*, 606 F.3d at 249. And Deanovich's overall credibility could be further questioned because he testified at the traffic hearing, presumably under oath, that

Dye had admitted to drinking earlier in the night, ECF No. 24-8 at PageID.323, despite the fact that Dye adamantly denied ever drinking, ECF No. 24-4 at PageID.185, 187.

Second, a reasonable juror watching the bodycam footage could find that Dye was not being "uncooperative" or "nonresponsive," in his initial engagement with Deanovich, but was simply choosing not to answer any questions calling for an incriminating answer, which is his legal right, as Defendants conceded at the February 2025 hearing. ECF Nos. 24-3 at 1:03–1:55; 24-4 at PageID.182. Given *which* questions Dye did not answer, a jury could find that his silence was not suspicious or indicative of drunkenness—particularly considering Dye immediately offered his license and registration to Officer Deanovich. *Id.*

Finally, a reasonable juror could disagree with Defendants' contention that Dye kneeling down with his hands behind his back was evidence of drunkenness. True, Officer Deanovich's only instruction at that moment was for Dye to put his hands behind his back. ECF No. 24-4 at PageID.182. But Dye testified that he knelt while complying because did not want Officer Deanovich to shoot him. ECF No. 24-6 at PageID.246. To be sure, Officer Deanovich might not have known that was *why* Dye knelt down, but a jury could find that a reasonable officer would view such an act not as evidence of drunkenness, but as evidence of compliance—especially considering the disproportionate risk that Black men, like Dye, will face violence at

the hands of the police during a traffic stop. *See United States v. Di Re*, 332 U.S. 581, 595 (1948) ("Probable cause cannot be found from submissiveness.").

That leaves only two undisputed facts—Dye's driving infractions and the time of night—neither of which demonstrates that Defendants are entitled to summary judgment. None of the cases Defendants rely upon are analogous enough to support the assertion that probable cause existed here; each had far more indicia of drunkenness or drug impairment than just improper driving late at night. *See Eckford v. City of Fremont*, No. 3:04 CV 7083, 2005 WL 1661571, at *1, *8 (N.D. Ohio July 15, 2005) (noting that plaintiff's eyes were "glassy, hazy and red and his speech was slurred," he "was verbally abusive and spoke 'very loudly'" to the officers, smelled strongly of alcohol, and refused to submit to field-sobriety tests); *United States v. Carlton*, 44 F. App'x 720, 721, 723 (6th Cir. 2002) (noting that plaintiff admitted to smoking marijuana, had "very bloodshot" eyes and spoke with "cotton mouth," and there was a "strong ammonia-like smell" coming from the car); *Onwenu v. Bacigal*, No. 18-cv-10980, 2019 WL 5788598, at *1 (E.D. Mich. Nov. 6, 2019), *aff'd in part, vacated in part, remanded*, 841 F. App'x 800 (6th Cir. 2021) (noting that "[plaintiff] first denied and then admitted that he had consumed alcohol earlier in the evening, interrupted [defendant], provided numerous non-responsive answers to [defendant's] questions, attempted to drive off while [defendant] still had his

[plaintiff's] driver's license, and failed to complete a preliminary breath test despite being given eight opportunities to blow enough air into the testing device").

By contrast, in the most analogous case, *Miller*, the Sixth Circuit denied summary judgment even though the plaintiff there admitted to a traffic violation around midnight. *Miller*, 606 F.3d at 245, 248–49. Similarly here, the truth of the disputed facts could change the outcome of this case, so there remain material fact questions. *Anderson*, 477 U.S. at 248 ("disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Because this is not a case in which only one possible conclusion can be drawn from the evidence, the existence of probable cause (and the facts to support it) must be resolved by a jury. *Gardenhire*, 205 F.3d at 315; *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial'" (quoting *Anderson*, 477 U.S. at 249)). And because the question of whether Defendants' conduct violated the Constitution "turns upon which version of the facts one accepts," qualified immunity is improper at this juncture. *Sova*, 142 F.3d at 903.

## C. False Imprisonment

Dye next alleges that the Officers violated his Fourth and Fourteenth Amendment rights through false imprisonment. ECF No. 1 at PageID.14–15. The Officers again respond they are entitled to qualified immunity. ECF No. 24 at PageID.153.

To prove false imprisonment under the Fourth or Fourteenth Amendment, a plaintiff must establish that he was detained without legal process. *See Wallace v. Kato*, 549 U.S. 384, 388–90 (2007); *see also Myers v. Koopman*, 738 F.3d 1190, 1195 (10th Cir. 2013) ("Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims."); *Brown v. Dart*, 876 F.3d 939, 941 ("False imprisonment, for purposes of a § 1983 claim, is defined as detention without legal process."). A § 1983 claim for false imprisonment is analyzed the same manner as a false-arrest claim, and thus, "the existence of probable cause for an arrest totally precludes any [§ 1983] claim for. . . false imprisonment. . . regardless of whether the defendants had malicious motives for arresting the plaintiff." *Wolgast v. Richards*, 389 F. App'x 494, 501 (6th Cir. 2010) (quoting *Gumble v. Waterford Twp.*, 171 F. App'x 502, 507 (6th Cir. 2006))).

Here, Defendants argue that the arrest was supported by probable cause, so Dye's false-imprisonment claim is precluded. But as discussed above, genuine disputes exist as to the probable cause for Dye's arrest. *See* Part III.A., *supra*. Those

same disputes prevent summary judgment on the false imprisonment claim.
Summary judgment will thus be denied.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that:

1. The City of Hazel Park is **DISMISSED WITH PREJUDICE** according to
   the Parties' August 2024 Order of Stipulated Dismissal, ECF No. 28; and

2. Defendants' Motion for Summary Judgment, ECF No. 24, is **DENIED**.


                                      _/s/Susan K. DeClercq_____
                                      SUSAN K. DeCLERCQ
                                      United States District Judge

Dated:  March 19, 2025